WIENER, Circuit Judge:
According to its title, the federal murder-for-hire statute, 18 U.S.C. § 1958 (“ § 1958”), criminalizes the “[u]se of interstate commerce facilities in the commission of murder-for-hire.”[1] The statute proscribes paying another to commit murder, but only when the defendant either (1) “travels in or causes another (including the intended victim) to travel in interstate or foreign commerce,” or (2) “uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce.”[2] Both of the instant *313 cases concern only the second prong of § 1958’s jurisdictional element, the use of an interstate (or foreign) commerce facility-
In United States v. Cisneros,[3] a panel of this court suggested in dicta that, to satisfy the jurisdictional element, a facility must be used in an inter state fashion, i.e., that intra state use of a facility would not suffice, even though that facility is one that generally is an interstate commerce facility. In contrast, a divided panel of this court held, in United States v. Marek[4] that wholly intra state use of a facility that is an interstate commerce facility is sufficient to satisfy § 1958’s jurisdictional element.[5] The Marek majority acknowledged Cisneros but reasoned that it was not binding because, in furtherance of her murder-for-hire scheme, Cisneros had caused international telephone calls to be made, an activity that indisputably satisfied the jurisdictional element even if Ma-rek’s wholly intra state communication might not. Thus, the portion of Cisneros that suggests that § 1958’s application is limited to interstate use of an interstate commerce communication facility is dicta.[6]
To reconcile these differences and announce a consistent position for this Circuit, we voted to rehear both cases en banc,[7] which had the collateral effect of vacating both panel decisions. We now adopt the position taken by the panel majority in Marek and hold that § 1958’s use. of a “facility in interstate commerce” is synonymous with the use of an “interstate commerce facility” and satisfies the jurisdictional element of that federal murder-for-hire statute, irrespective of whether the particular transaction in question is itself inter state or wholly intra state.
I.
FACTS AND PROCEEDINGS
A. Marek
The facts are not in dispute. Defendant-Appellant Betty Louise Marek pleaded guilty to paying an undercover FBI agent, who was posing as a hit-man, to murder her boyfriend’s paramour. Marek was arrested after she used Western Union to transfer $500 to the putative hit-man. Marek initiated the wire transfer in Houston, Texas, and it was received in Harlingen, Texas. The government introduced no evidence to show that the Western Union transmission actually crossed the Texas state line en route from Houston to Harlingen, so we must assume that it did not.[8]
After the district court had accepted Marek’s guilty plea and subsequently sentenced her, she appealed her conviction, urging that the district court erred when it found that she had admitted to facts that satisfied each legal element of the crime charged. Convinced that Western Union is “a facility in interstate commerce,” and that this phrase is synonymous with “interstate commerce facility,” a divided pan *314 el of this court affirmed her conviction, holding that Marek’s wholly intra state use of Western Union was sufficient to satisfy the jurisdictional element of § 1958.[9]
B. Cisneros
The relevant facts in Cisneros also are undisputed at this juncture. Doris Cisne-ros wanted to have her daughter’s erstwhile boyfriend killed. Cisneros told this to her fortune teller and asked if the seer would find someone to commit the murder for a price. Acting as Cisneros’s agent, the clairvoyant — through another client— ultimately located and employed two hit-men for Cisneros. In doing so the oracle placed and received international phone calls between Texas and Mexico. The hit-men traveled from Mexico to Brownsville, Texas, where they shot and killed Cisne-ros’s intended victim.[10] A jury convicted Cisneros, and she appealed.
A panel of this court concluded that a reasonable jury could have found that (1) the fortune teller had participated in international telephone calls as Cisneros’s agent, and (2) those calls were-sufficiently connected to the murder to be “in furtherance” of that crime.[11] The panel therefore affirmed Cisneros’s conviction.
A crucial factual distinction between Marek and Cisneros exists: In Cisneros the subject telephone calls were unquestionably international so the use of the telephone facility was international (“foreign”), as is the telephone facility itself; in Marek, however, there was only an intra state communication (a wire transfer of funds between two Texas cities), albeit the communication facility, Western Union, is an interstate commerce facility. Therefore, to affirm Marek we must conclude that § 1958 reaches mira state use of a facility in interstate commerce. In Cisneros, on the other hand, even if we assume arguendo that the statute should be accorded the narrowest interpretation possible, we must affirm Cisneros’s conviction on the strength of the international (foreign) telephone calls.
II.
STANDARDS OF REVIEW
Cisneros was convicted by a jury. If, after viewing the evidence and all reasonable inferences in the light most favorable to the verdict, we conclude that a rational trier of fact could find that the government proved each essential element of the crime of conviction beyond a reasonable doubt, we must affirm.[12]
Marek, in contrast, pleaded guilty. We review guilty pleas for compliance with Rule 11 of the Federal Rules of Criminal Procedure. Here, the determinative question is whether there is an adequate factual basis in the record from which the district court could conclude as a matter of law that Marek’s conduct satisfies each element of § 1958. That Marek pleaded guilty — a legal conclusion on her part — ostensibly admitting to discrete facts supporting the charge against her, is not itself sufficient to support her guilty plea.[13] Subsection (D of Rule 11 requires the district court to determine that the factual conduct to which the defendant admits is sufficient as a matter of law to constitute a violation of the statute.[14] Rule 11(f) reads:
*315 (f) Determining accuracy of plea. Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.
The Supreme Court has explained that this requirement — mandating that the district court compare (1) the conduct to which the defendant admits with (2) the elements of the offense charged in the indictment or information' — -“is designed to ‘protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but mthout realizing that his conduct does not actually fall within the charge.”’[15] Implicit in the district court’s acceptance of Marek’s plea of guilty, then, was its determination that her admitted conduct satisfies every legal element of the federal murder-for-hire statute.
 Marek did not raise a challenge to the adequacy of the factual basis underlying her guilty plea in the district court, either by making her plea conditional pursuant to Rule 11(a)(2) or by objecting thereafter, such as at her sentencing. Rather, she raised it for the first time on appeal. We have repeatedly held that when a defendant, for the first time on appeal, presents a straightforward issue of law — here, whether the undisputed factual basis is sufficient as a matter of law to sustain the guilty plea — we will review that issue for plain error.[16]
Plain error review requires the appellant to show (1) there is an error, (2) that is clear and obvious, and (3) that affects his substantial rights.[17] If these factors are established, the decision to correct the forfeited error still lies within our sound discretion, which we will not exercise unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.[18]
The first of the three facets of plain error that we must address is whether there was error. To answer this threshold question when Rule 11(f) is implicated, we must examine, parse, and interpret § 1958, the criminal statute under which Marek was convicted of murder-for-hire. Only by determining the elements of that crime and comparing each element to the facts admitted by Marek, as set forth in the factual basis during the plea colloquy, can we determine if there was error ml non.
III.
STATUTORY CONSTRUCTION
In Marek’s case we must ask whether, for purposes of satisfying the jurisdictional element of the federal murder-for-hire statute, it is sufficient that the defendant used an interstate commerce facility in an intra state fashion. Asked differently, is it necessary that both (1) the facility and (2) the defendant’s use of that facility be in interstate or foreign commerce? To answer this question, we will look first to the plain language of the statute and second to its statutory context.
A. Statutory Language

§ 1958. Use of interstate commerce facilities in the commission of murder-for-hire

*316 (a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined [or imprisoned] under this title[.]
(b) As used in this section and section 1959—
(1) “anything of pecuniary value” means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage;
(2) ‘facility of interstate commerce ” includes means of transportation and communication; and
(3) “State” includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.[19]
As is patent on the face of the statute, this crime can be committed by engaging in either of two distinct activities: (1) travel or (2) use. If, in Marelc or Cisneros (or both), the jurisdictional element was satisfied, it must have been under the use prong, as the travel prong is nowhere implicated'.[20] The travel and use prongs are distinguishable by the divergent natures of the two activities: Travel requires the physical movement of a person, such as by walking, running, or riding in or on a bike, car, wagon, train, bus, or airplane; in contrast, use contemplates a perpetrator who remains essentially stationary while causing an inanimate object to be (1) communicated (e.g., a letter, telegram, or money order) or (2) transported (e.g., a gun, a bomb, or cash).[21] The statute’s definition of travel never mentions the facility; presumably a perpetrator could violate the travel prong on foot, using no “facility” at all, as, for example, by hiking cross-country to deliver the blood money.
The key question of statutory construction presented in Marek is whether, under the use prong of § 1958, the phrase “in interstate or foreign commerce” modifies “use” or modifies “facility.” Purely from a structural viewpoint, we must conclude that “in interstate or foreign commerce” is an adjective phrase that modifies “facility,” the noun that immediately precedes it — not an adverbial phrase that modifies the syntactically more remote verb, “[to] use.” We see the former conclusion as the more natural and sensible reading of the relevant portion of the statute. Primarily because of the proximity of “in interstate or foreign commerce” to “facility,” the word which that phrase modifies is facility and not use. A contrary conclusion — that “in interstate or foreign commerce” modifies “use” — would require a strained structural interpretation of the statute.[22]
*317 B. Statutory Context
When it adopted § 1958, Congress was acting within the second of three broad categories identified by the Supreme Court in United States v. Lopez[23] as conduct appropriately subject to regulation under the Commerce Clause.[24] Of the second category, the Court wrote that “Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.” [25] When Congress regulates and protects under the second Lopez category, therefore, federal jurisdiction is supplied by the nature of the instrumentality or facility[26] used, not by separate proof of interstate movement.[27] Under statutes similar to § 1958, federal jurisdiction based on intra state use of inter state facilities is an appropriate exercise of the commerce power, as this and other circuit courts repeatedly have found.
In United States v. Heacock,[28] this circuit concluded that the U.S. Post Office is a “facility in interstate commerce,” and that intrastate mailings satisfied the jurisdictional requirement of the Travel Act.[29] Significant to our analysis today, the Heacock opinion alludes to the mail’s unique history but never mentions Congress’s postal power,[30] instead stressing the status of the mail as an interstate commerce facility:
In other words, whenever a person uses the United States Post Office to deposit, to transport, and to deliver parcels, money, or other material by means of the mail, that person clearly and unmistakably has used a “facility in interstate commerce,” irrespective of the intrastate destination of the item mailed.[31]
*318 Congress had made the sufficiency of intrastate mailings plain in a 1990 amendment entitled “Clarification of applicability of 18 U.S.C.1952 to all mailings in furtherance of unlawful activity.”[32] The amendment changed § 1952’s wording slightly to mirror that of § 1958, targeting “[wjhoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce.”[33] As Congress thus expressly made clear that § 1952 applies to intrastate mailings, and did so by importing § 1958’s wording into § 1952, logic dictates that precisely the same wording in § 1958 must apply equally to intrastate use of other interstate facilities, such as Western Union.
In a similar vein, through passage of a 1994 amendment to the federal mail fraud statute, Congress expanded 18 U.S.C. § 1341 to reach private interstate commercial carriers, such as Emery, DHL, and Federal Express, in addition to the U.S. Postal Service. Although no circuit court has addressed whether that amendment requires the crossing of state lines to establish jurisdiction, one district court recently held that the amended statute does cover “purely intrastate delivery of mails by private or commercial carriers as long as those carriers engage in interstate deliveries... .While jurisdiction lies only under the Commerce Clause for the use of private or commercial carriers, Congress may still regulate their intrastate activities because they are instrumentalities of interstate commerce.”[34] Here again, the conclusion is appropriate because intrastate use of interstate facilities is properly regulated under Congress’s second-category Lopez power.
Mail and delivery services are not the only “means of transportation and communication” amenable to congressional Commerce Clause protection under Lopez during wholly intrastate use. Interstate commerce facilities that have created a criminal federal jurisdictional nexus during intrastate use include telephones,[35] au *319 tomobiles,[36] and airplanes.[37] Perhaps most analogous to Marek’s use of Western Union are the facts of United States v. Baker,[38] an Eighth Circuit case holding that an interstate network of automatic teller machines (“ATMs”) is a facility in interstate commerce “squarely within the literal language of the Travel Act.”[39] In Baker, the Eighth Circuit upheld a Travel Act conviction based on an extortion victim’s cash withdrawal from his local bank using another local bank’s ATM.
The Baker court noted that, even though the transaction at issue was strictly local, customers could use the ATM network to make interstate deposits and withdrawals, and the court noted: “Though [the victim’s] withdrawal triggered an entirely intrastate electronic transfer between [the two local banks], the jury found that [the defendant] caused [the victim] to use a facility in interstate commerce.”[40]
The dissent notes that we are splitting with the Sixth Circuit’s interpretation of § 1958 in United States v. Weathers,[41] in which that court found jurisdiction proper based on a defendant’s in-state call using a cellular telephone that sent an interstate search signal. Although the holdings of this case and Weathers do not actually conflict with each other, it is true that our reasoning does: As noted above,[42] however, the Sixth Circuit’s reasoning that the use of an instrumentality in interstate commerce (i.e., the mail) requires the crossing of state lines was expressly rejected by congressional amendment of the Travel Act.[43] We did not follow that reasoning in Heacock and we decline to do so now, particularly given Congress’s use of the very language of § 1958 we interpret today to remove any possible doubt that the Travel Act applies even to intrastate mailings.[44]
*320 We are satisfied that when § 1958 is read as a whole and viewed in context as part of the power of Congress to regulate and protect the instrumentalities of interstate commerce, even when the threat comes from intrastate activities,[45] it becomes clear that the facility, not its use, is what must be “in interstate or foreign commerce.” In the instant context, then, when a facility employed to advance murder-for-hire is in interstate or foreign commerce generally, the jurisdictional element of § 1958 is satisfied even though the particular use of the facility on the specific occasion in question is only intra state. Thus, both (1) Marek’s intrastate use of Western Union — a quintessential facility in interstate commerce — to transfer funds within Texas, and (2) Cisneros’s international telephone calls, are sufficient to satisfy the jurisdictional element of § 1958, and- — more importantly — that jurisdictional element is present in the statute through a valid exercise of congressional Commerce Clause power under the second Lopez category.
As Marek’s use of Western Union satisfies the jurisdictional element of the statute, the district court properly discharged its duty under Rule 11(f). Thus, there was no error. And, in the absence of an error, there obviously can be no plain error.
C. Statutory Ambiguity
Marek nevertheless contends that subsection (b)(2) of § 1958 — which explains that “facility of interstate commerce” includes both means of transportation and means of communication — introduces an ambiguity into the statute. Marek’s argument goes as follows: There is an inconsistency between the statute’s substantive subsection (§ 1958(a)), which uses the phrase “facility in interstate or foreign commerce,” on the one hand, and subsection (b)(2)’s “defining” of the phrase “facility of interstate commerce,” on the other. Marek contends that the phrase used in the substantive subsection (“facility in interstate commerce”) implicates a more restricted class of facilities than does the phrase used in the “definitional” subsection (“facility of interstate commerce”) because, she insists, for a facility to be in interstate commerce, there must be a nexus between the facility and its use in interstate commerce. In other words, in Ma-rek’s view, facilities are only in interstate commerce when they are employed in an interstate fashion, whereas a facility that is almost always used in interstate commerce (like Western Union) remains a facility of interstate commerce, even in instances when its use is intrastate. Given this inconsistency between the substantive provision of subsection (a) and the explanatory provisions of subsection (b)(2), urges Ma-rek, the substantive subsection must predominate. Thus, continues Marek’s argument, as her use of Western Union (which she admits is a facility of interstate commerce) was wholly intra state it was not the use of a facility in interstate commerce, even though the facility itself is an interstate commerce facility. Not surprisingly, we disagree.
First, we find the inconsistency between § 1958(a) and (b)(2) to be more apparent than real, and that use of slightly different phraseology in the clarification section (“of’ rather than “in”) was not intended by Congress to limit the scope of the statute. Subsection (b)(2) does not “define” facility; rather, it merely clarifies that a facility can be a means of transportation, such as an interstate delivery service, or a means of communication, such as a telegraph or telephone network. As the travel prong of the statute never mentions “facility,” subsection (b)(2) applies only to the use prong, merely clarifying that it covers the sending of things as well as messages. For example, sending a bomb from Houston to Har-lingen via UPS would involve transportation because a “thing” is sent, but sending a letter from Houston to Harlingen via Federal Express would involve communi *321 cation because only a message is sent. In both instances, however, a “facility” is “used.” Despite Marek’s effort to create ambiguity out of whole cloth, we perceive none.
The legislative history of § 1958 is even more persuasive. A 1983 Senate Judiciary Committee report describes the offense punishable under the murder-for-hire statute as “the travel in interstate or foreign commerce or the use of the facilities of interstate or foreign commerce or of the mails, as consideration for the receipt of anything of pecuniary value, with the intent that a murder be committed.”[46] The report later explains that “[t]he gist of the offense is the travel in interstate commerce or the use of the facilities of interstate commerce or of the mails with the requisite intent and the offense is complete whether or not the murder is carried out or even attempted.”[47] Even though the statute was not intended to usurp the authority of state and local officials, the report states, “the option of Federal investigation and prosecution should be available when a murder is committed or planned as consideration for something of pecuniary value and the proper Federal nexus, such as interstate travel, use of the facilities of interstate commerce, or use of the mails, is present.”[48] In a discussion of the murder-for-hire portion of the bill extending over three pages, the Senate report uses the phrase “facility [or facilities] of interstate commerce” four times and “facility in interstate commerce” only once, drawing no apparent distinction between the two. We find inescapable the conclusion that “of’ and “in” were considered and used by Congress as synonyms in regards to this particular statute.
We hold today that the statute is unambiguous and clear on its face. But even if we were to assume, for argument’s sake, that the statute is ambiguous, any lingering doubt regarding the statute’s meaning is laid to rest by the title of the section. The title of § 1958 — “Use of interstate commerce facilities in the commission of murder-for-hire” — plainly eliminates any claim of ambiguity. The title is unambiguous and clearly employs “interstate commerce” to modify “facility,” not “use.” The Supreme Court has held that it is appropriate to consider the title of a statute in resolving putative ambiguities:
Among other things which may be considered in determining the intent of the legislature is the title of the act.... Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived; .and in such case the title claims a degree of notice, and will have its due share of consideration.... The title of an act cannot control its words, but may furnish some aid in showing what was in the mind of the legislature.[49]
More recently, the Court reiterated: “While the title of an act will not limit the plain meaning of the text, it may be of aid in resolving an ambiguity.”[50] The title of § 1958 spells out the activity Congress meant to punish under the statute, eschewing ambiguity.[51]
*322 Section 1958 employs three phrases to describe “facility” in the context of the statute: “interstate commerce facilities” in the title; “facility in interstate or foreign commerce” in subsection (a); and “facility of interstate commerce” in subsection (b)(2). A review of the statute, its legislative history, and the United States Code as a whole indicates that, at least in this statute, Congress used these terms interchangeably as synonyms.
Not to be dissuaded, Marek further contends that: (1) Even if we reject her construction of the statute in favor of the government’s, we must nevertheless find that both constructions are reasonable and choose the narrower one pursuant to the rule of lenity; (2) the government’s construction raises doubts about the statute’s constitutionality, which must be resolved in a way that avoids potential constitutional infirmity; and (3) the federal murder-for-hire statute criminalizes conduct that is traditionally the province of state law enforcement, and Congress should not be presumed to have altered the federal-state balance unless it speaks with unmistakable clarity. We dispose of each of these contentions in turn.

1.Rule of Lenity

The rule of lenity — a rule of narrow construction rooted in concern for individual rights, awareness that it is the legislature and not the courts that should define criminal activity, and belief that fair warning should be accorded as to what conduct is criminal — -applies when, but only when, “after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute.”[52] We are convinced that this is not such a case and, under these circumstances, we will not “blindly incant the rule of lenity to ‘destroy the spirit and force of the law which the legislature intended to and did enact.’ ”[53]
Additionally, the rule of lenity should not be invoked here because it was no surprise to Marek that murder-for-hire is a serious crime with serious penalties. The principle behind the rule of lenity is that no one should be forced to speculate whether her conduct is prohibited.[54] It would be absurd to say that Marek did not know that her conduct — hiring an assassin to commit murder — was prohibited.
2. Constitutional Doubt
The rule of constitutional doubt is likewise inapplicable. Marek contends that a broad application of § 1958 to intrastate activities would violate the Tenth Amendment, compelling adoption of the narrow interpretation of the statute she advocates to save it from constitutional infirmity. For all the reasons stated above, however, the statute’s requirement that a perpetrator either travel in interstate commerce or use an interstate commerce facility confirms that the statute raises no constitutional concerns, given Congress’s clear constitutional authority to regulate interstate commerce. “[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.” [55]
3. Federal-State Balance
Finally, Marek argues that the intention to alter the federal-state balance in this *323 area — traditionally the province of state law enforcement — must be evidenced by unmistakable clarity. For the same reasons that we reject application of the rule of lenity — that (1) the statute is plain on its face, and (2) even if we concede for the sake of argument that there is some slight internal inconsistency in terminology, it is resolved by the statute’s legislative history and title — we reject the notion that Congress has not spoken with sufficient clarity to criminalize conduct traditionally the subject of state criminal laws.
Like Marek’s, the dissent’s lament over the perceived trampling of states’ rights misses the mark by the palpable failure to include a crucial observation: Under § 1958, federal authorities have nothing more than concurrent jurisdiction over the subset of murders-for-hire that bear the requisite nexus with interstate commerce. The legislative history plainly states that federal investigation and prosecution should be no more than an “option” to be “used in appropriate eases” to assist state and local authorities, and that “Federal jurisdiction should be asserted selectively based on such factors as the type of defendants reasonably believed to be involved and the relative ability of the Federal and State authorities to investigate and prosecute.”[56]
The records in both of these cases eschew any possibility that federal authorities preemptively muscled aside local law enforcement; rather, federal law enforcement was invited by the locals to become involved. Cisneros first was tried and convicted of capital murder in state court. Only after a Texas appellate court reversed that conviction for insufficiency of the evidence did the state take the initiative and turn over her case to federal prosecutors.[57] As for Marek, a county sheriffs deputy tipped to her quest for a mercenary killer referred the case to the Texas Rangers, who in turn referred the case to the FBI. The two cases before us illustrate the very “[cooperation and coordination between Federal and State officials” that Congress intended that § 1958 foster.[58] The embodiment of such clear legislative intent in providing for concurrent jurisdiction and not preemption must not be overlooked in analogizing the extent of congressional intrusion into spheres of state and local law enforcement. With all due respect, we believe that the dissent would be well advised to pull back its states’ rights argument. Failure to acknowledge that § 1958 creates concurrent jurisdiction only subjects the dissent’s objectivity to question. For despite its power to preempt this area when regulating commerce, Congress exercised restraint and comity, in the true spirit of Federalism, by creating only concurrent jurisdiction.
TV.
CONCLUSION
For the foregoing reasons, we hold that both Cisneros’s arid Marek’s murder-for-hire transactions violated 18 U.S.C. § 1958. Cisneros did so by causing her agent to make qualifying telephone calls between the United States and Mexico, thereby using a facility in foreign commerce to facilitate a murder-for-hire. Ma-rek did so by using an interstate commerce facility, Western Union, to wire blood money between Houston and Harlin-gen, Texas. Satisfied that intrastate use of an interstate commerce facility has satisfied federal jurisdiction under § 1958, there was no error, plain or otherwise, in Marek’s conviction or her plea of guilty. We therefore affirm both appellants’ convictions and sentences.
AFFIRMED.

. Emphasis added.

. 18 U.S.C. § 1958.

. 203 F.3d 333 (5th Cir.2000), vacating 194 F.3d 626 (5th Cir.1999).

. 198 F.3d 532 (5th Cir.1999), reh’g granted, 206 F.3d 449 (5th Cir.2000).

. Id. at 538.

. Id. at 534 & n. 1.

. 206 F.3d 448, 448-49 (5th Cir.2000).

. As described in a recent Fifth Circuit case, however, the Western Union procedure for wiring money from one Texas city to another (in that case, from Lufkin to Beaumont) required Western Union agents in both cities to call the company's main computer in Bridge-ton, Missouri. See United States v. Brumley, 79 F.3d 1430, 1432-33 (5th Cir.1996), rev'd on other grounds en banc, 116 F.3d 728, 731 (5th Cir.1997) (affirming convictions and noting that the wire transfers "were. accomplished electronically through a Western Union facility located outside of Texas”); see also United States v. Davila, 592 F.2d 1261, 1263 (5th Cir.1979) (upholding wire fraud conviction under 18 U.S.C. § 1343 of defendant who used Western Union to send money between San Antonio and McAllen when all wire transfers were routed through Middle-town, Virginia).

. The facts are set forth more fully in the panel majority's opinion. Marek, 198 F.3d at 533.

. The facts are set forth more fully in the panel opinion. Cisneros, 203 F.3d at 337-39.

. Id. at 343-45.

. Cisneros, 203 F.3d at 343 (citing United States v. Grossman, 117 F.3d 255, 258 (5th Cir.1997)).

. United States v. Briggs, 939 F.2d 222, 227-28 (5th Cir.1991); United States v. Oberski, 734 F.2d 1030, 1031 (5th Cir.1984).

. Briggs, 939 F.2d at 227-28.

. McCarthy v. United States, 394 U.S. 459, 467, 89 S.Ct 1166, 22 L.Ed.2d 418 (1969) (quoting Fed.R.Crim.Pi 11, Notes of Advisory Committee on Criminal Rules) (emphasis added).

. United States v. Angeles-Mascote, 206 F.3d 529, 530 (5th Cir.2000); see also United States v. Johnson, 194 F.3d 657, 660 (5th Cir.1999), vacated on other grounds, -U.S. -, 120 S.Ct. 2193, - L.Ed.2d- (2000); United States v. Ulloa, 94 F.3d 949, 951-54 (5th Cir. 1996); United States v. Knowles, 29 F.3d 947, 950-51 (5th Cir.1994).

. United States v. Calverley, 37 F.3d 160, 162-64 (5th Cir.1994) (en banc) (citing United States v. Olano, 507 U.S. 725, 730-37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)), abrogated in part on other grounds, Johnson v. United States, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

. Olano, 507 U.S. at 735-36, 113 S.Ct. 1770.

. 18 U.S.C. § 1958 (emphasis added).

. The record in Cisneros reveals that the hit-men traveled from Mexico to Texas to perform the murder-for-hire. The panel concluded that the jurisdictional element was satisfied by the international telephone calls and thus did not consider if the jurisdictional element was satisfied by international travel. Cisneros, 203 F.3d at 345. We do the same.

. See 18 U.S.C. § 1958(b)(2) (slating that " 'facility of interstate commerce’ includes means of transportation and communication”).

.The dissent argues that the statute's drafters need have resorted to an unduly awkward grammatical construction to modify "in interstate or foreign commerce” with "use.” Were that Congress’s intention, however, the statute could have been phrased smoothly several different ways: To criminalize any use of the mail but only interstate use of other facilities, for example, the drafters could have tar *317 geted "interstate use of a facility or use of the mail with intent that a murder be committed.” To further narrow the statute and criminalize only interstate use of the mail or any other facility, one possible phrasing would be "interstate use of a facility or the mail with intent that a murder be committed.” Congress knows how to write this requirement when it so chooses. See, e.g., 18 U.S.C.A. § 247(b) (formerly criminalizing damage to religious property by a defendant who "uses a facility or instrumentality of interstate or foreign commerce in interstate or foreign commerce”; amended to apply to offense that "is in or affects interstate or foreign commerce” by Church Arson Prevention Act of 1996, Pub.L. No. 104-155, § 3(3), 110 Stat. 1392 (1996)).

. 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

. U.S. Const, art. 1, § 8, cl. 3.

. Lopez, 514 U.S. at 558, 115 S.Ct. 1624 (emphasis added). The Court cited, inter alia, Shreveport Rate Cases, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914) (holding that the Interstate Commerce Commission could regulate intrastate railway rates to protect interstate commerce), and Southern R. Co. v. United States, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911) (upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce).

. We find no meaningful distinction between the terms “facilities” and "instrumentalities” of interstate commerce. Cisneros, 203 F.3d at 340 n. 4.

. See Peter J. Henning, Maybe It Should Just Be Called Federal Fraud: The Changing Nature of the Mail Fraud Statute, 36 B.C. L.Rev. 435, 471 (1995).

. 31 F.3d 249, 255 (5th Cir.1994).

. 18 U.S.C. § 1952. We have previously held that it is appropriate to interpret § 1958 in light of § 1952 given that the two sections employ similar language, and that § 1958 was intended to supplement § 1952. United States v. Edelman, 873 F.2d 791, 794 (5th Cir.1989).

. U.S. Const, art. 1, § 8, cl. 7.

. Heacock, 31 F.3d at 255. The dissent argues that our Heacock decision was based on the Second Circuit's reasoning in United States v. Riccardelli, 794 F.2d 829 (2d Cir.1986), that the mail is a "special case, separate and distinct from ‘facilities in interstate or foreign commerce.’ " While it is undoubtedly true that the mail is a "special case,” the Riccardelli analysis that we actually quoted in Heacock — reproduced here in its entirety— does not support the dissent’s inference: " 'The positioning of the phrase "including *318 the mail” in the statute singles out the mail for special treatment and thus consistent with the historical understanding of the United States mail, equates the use of the mail with the use of other facilities of interstate and foreign commerce; it does not indicate that the mailing itself must be interstate.' " Heacock, 31 F.3d at 255 (quoting Riccardelli, 794 F.2d at 831) (emphasis added).

. Crime Control Act of 1990, Pub.L. No. 101-647, § 1604, 104 Stat. 4789, 4843 (1990); see also Krantz v. United States, 1999 WL 557524, at *4 (E.D.N.Y.1999), appeal dismissed, 224 F.3d 125 (2d Cir.2000). The amendment was passed a year after the Sixth Circuit held in United States v. Barry, 888 F.2d 1092 (6th Cir.1989), that only interstate use of the mail satisfied § 1952’s jurisdictional nexus. The Second Circuit earlier had decided the opposite in Riccardelli.

. Before amendment, § 1952 applied to "[wjhoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail.” This is the language interpreted in Heacock.

. United States v. Photogrammetric Data Services, Inc., 103 F.Supp.2d 875, 882 (E.D.Va. 2000).

. United States v. Weathers, 169 F.3d 336, 341 (6th Cir.1999) ("It is well established that telephones, even when used intrastate, constitute instrumentalities of interstate commerce.”), cert. denied, 528 U.S. 838, 120 S.Ct. 101, 145 L.Ed.2d 85 (1999); United States v. Gilbert, 181 F.3d 152, 158-59 (1st Cir.1999) (finding jurisdiction under 18 U.S.C. § 844(e), concerning threats made "through the use of the mail, telephone, telegraph, or' other instrument of interstate or foreign commerce, or in or affecting interstate or foreign commerce”); United States v. Clayton, 108 F.3d 1114, 1117 (9th Cir.1997) (cellular telephones); United States v. Houlihan, 92 F.3d 1271, 1292 (1st Cir.1996) (assuming that telephones are facilities in interstate commerce under § 1958); Alley v. Miramon, 614 F.2d 1372, 1379 (5th Cir.1980) (stating, in a securities case, that the court "has consistently held that the intrastate use of the telephone may confer jurisdiction over a private action under Section 10(b) and Rule 10b-5.” Rule 10b-5 supplies jurisdiction "by the use of any means or instrumentality of interstate commerce or of the mails.”).

. United States v. Bishop, 66 F.3d 569, 589 (3d Cir.1995) (writing that Congress’s power to criminalize intrastate carjacking "derives from the [automobiles’] status as instrumen-talities”); see also United States v. Cobb, 144 F.3d 319, 322 (4th Cir.1998); United States v. McHenry, 97 F.3d 125, 126 (6th Cir.1996); United States v. Oliver, 60 F.3d 547, 550 (9th Cir.1995), rev'd on other grounds, Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

. United States v. Hume, 453 F.2d 339, 340 (5th Cir.1971) (finding that 18 U.S.C. § 32, which criminalizes damage to “civil aircraft used, operated, or employed in interstate, overseas, or foreign commerce,” protects aircraft even while they are not actually operating interstate).

. 82 F.3d 273 (8th Cir.1996), cert. denied, 519 U.S. 1020, 117 S.Ct. 538, 136 L.Ed.2d 423 (1996).

. Id. at 276.

. Id. at 275.

. 169 F.3d 336 (6th Cir.1999), cert. denied, 528 U.S. 838, 120 S.Ct. 101, 145 L.Ed.2d 85 (1999).

. See supra note 32.

. The Sixth Circuit reasons that a statute regulating a "facility in interstate commerce” governs channels of interstate commerce, the first Lopez category, while a "facility of interstate commerce” falls into the second Lopez category, comprising the instrumentalities of interstate commerce. We conclude that the “use of facilities (in or of) interstate commerce” in violation of § 1958 falls into the second category. Because it is not necessary to this case, we do not decide whether § 1958’s "travel in interstate commerce” prong refers to the channels of interstate commerce, or to Lopez’s second-category "persons or things in interstate commerce.” See Lopez, 514 U.S. at 558, 115 S.Ct. 1624.

. The dissent, like the Sixth Circuit, would decide this case based on perceived differences in the meanings of "of” and "in.” In Dupuy v. Dupuy, 511 F.2d 641, 642-43 (5th Cir.1975), we found significant that the Securities Act of 1933 based jurisdiction on the use of instruments in interstate commerce, while the Securities Exchange Act of 1934 required use of an instrumentality of interstate commerce. We do not contend that similarly varying phraseology never can have statutory significance; we merely conclude, based on the grammatical structure of § 1958 and the use of both phrases interchangeably in the statute and its legislative history, that. Congress's particular deployment of these two prepositions in § 1958 is not dispositive of this case.

. Lopez, 514 U.S. at 558, 115 S.Ct. 1624.

. S.Rep. No. 98-225, at 304 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3484.

. Id. at 306, 3485.

. Id. at 305, 3484.

. Holy Trinity Church v. United States, 143 U.S. 457, 462, 12 S.Ct. 511, 36 L.Ed. 226 (1892).

. Maguire v. Commissioner of Internal Revenue, 313 U.S. 1, 9, 61 S.Ct. 789, 85 L.Ed. 1149 (1941) (citations omitted).

.The text of other sections of the U.S.Code use the same terminology as that found in § 1958's title. Both 18 U.S.C.A. § 1961 and § 2516 specifically refer to § 1958 and describe § 1958 as relating to the use of "interstate commerce facilities” in the commission of murder-for-hire. Thus, the title’s reference to "interstate commerce facilities” is not isolated, and cannot be presumed to be accidental.

. Smith v. United States, 508 U.S. 223, 239-40, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (internal citations, quotations, and alterations omitted) (quoting United States v. Bass, 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (quoting United States v. Fisher, 2 Cranch 358, 386, 2 L.Ed. 304 (1805))).

. Huddleston v. United States, 415 U.S. 814, 832, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974) (alteration omitted) (quoting American Tobacco Co. v. Werckmeister, 207 U.S. 284, 293, 28 S.Ct. 72, 52 L.Ed. 208 (1907)).

. Dunn v. United States, 442 U.S. 100, 112, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979).

. Caminetti v. United States, 242 U.S. 470, 491, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

. S.Rep. No. 98-225, at 304-05 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3484.

. Cisneros, 203 F.3d at 339. In fact, Cisne-ros charged before her trial in district court that the federal prosecution was "merely a sham or tool for the State of Texas.”

.S.Rep. No. 98-225, at 305 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3484.